**SO ORDERED,**

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: July 23, 2015**

**The Order of the Court is set forth below. The docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

STACY HOWARD AND                                    CASE NO. 00-51897-NPO
STEPHANIE HOWARD,

DEBTORS.                                            CHAPTER 13

## MEMORANDUM OPINION AND ORDER:
### (1) OVERRULING OBJECTION TO ABANDONMENT;
### (2) GRANTING THE GROUPED SETTLING DEFENDANTS JOINT MOTION
### TO SETTLE; AND (3) DENYING THE CONQUEST JOINT MOTION TO SETTLE

This matter came before the Court[1] for hearing (the "Hearing") on June 16, 2015 on the

Notice of Proposed Abandonment of Real Property (the "Notice of Abandonment") (Bankr. Dkt.

124)[2] filed by J.C. Bell, the standing chapter 13 trustee (the "Trustee"); the Reynolds Plaintiffs'

Brief in Support of the Trustee's Proposed Abandonment of Real Property (the "Reynolds

---

[1] The above-styled bankruptcy case (the "Bankruptcy Case") and Adversary Proceeding No. 14-05009-NPO (the "Adversary") were transferred from the Honorable Katharine M. Samson, United States Bankruptcy Judge, Southern District of Mississippi to the Honorable Neil P. Olack, United States Bankruptcy Judge, Southern District of Mississippi on June 11, 2014.

[2] Citations to the record are as follows: (1) citations to docket entries in the Bankruptcy Case are cited as "(Bankr. Dkt. ___)"; and (2) citations to docket entries in the Adversary are cited as "(Adv. Dkt. ___)".

Parties Brief in Support of Abandonment") (Bankr. Dkt. 134) filed by Fina Oil and Chemical Company; Murphy Oil U.S.A. Inc.; Vintage Petroleum, Inc.; Champlin Petroleum Company; Exxon Corporation; Kerr-McGee Oil & Gas Corporation n/k/a Anadarko US Offshore Corporation, a former affiliate of Oryx Energy Corporation; TXO Production; OXY USA Inc.; Placid Oil Company; Amoco Production Company; Union Oil Company of California; Phillips Petroleum Company; ConocoPhillips Company (formerly known as Phillips Petroleum Company and successor in interest by merger to Conoco, Inc.); Bass Enterprises Production Company; ARCO Oil and Gas Company; Mobil Oil Exploration & Producing Southeast, Inc.; and Inexco Oil Company (collectively, the "Reynolds Parties"); the Objection to Notice of Proposed Abandonment of Real Property (the "Objection to Abandonment") (Bankr. Dkt. 135) filed by Stephanie Howard (the "Debtor");[3] the Reynolds Plaintiffs' Response to the Debtor's Objection to the Trustee's Notice of Proposed Abandonment of Real Property (the "Reynolds Parties Response to Objection to Abandonment") (Bankr. Dkt. 137) filed by the Reynolds Parties; the Joint Motion to Settle and Compromise Disputed Claim Pursuant to Rule 9019 of the Bankruptcy Rules of Procedure (the "Reynolds Parties Joint Motion to Settle") (Bankr. Dkt. 143) filed by the Reynolds Parties and the Trustee; the Joinder of Chevron U.S.A. Inc., Chevron Corporation, Texaco Inc., Four Star Oil & Gas Company, and Shell Western E&P, Inc. in the Reynolds Plaintiffs' Joint Motion to Settle and Compromise Disputed Claim Pursuant to Rule 9019 of the Bankruptcy Rules of Procedure (Bankr. Dkt. 145) filed by Chevron U.S.A. Inc.; Chevron Corporation; Texaco Inc.; Four Star Oil & Gas Company; and Shell Western E&P, Inc.

---

[3] The Bankruptcy Case was commenced on May 5, 2000 by joint debtors, Stephanie Howard and Stacy Howard (collectively, the "Debtors"), but the Court refers only to Stephanie Howard as the "Debtor" because Stacy Howard is now deceased.

(collectively "Chevron/Shell"); the Joinder of Chevron U.S.A. Inc., Chevron Corporation, Texaco Inc., Four Star Oil & Gas Company, and Shell Western E&P, Inc. in the Reynolds Plaintiffs' Response to the Debtor's Objection to the Trustee's Notice of Proposed Abandonment of Real Property (Bankr. Dkt. 146) filed by Chevron/Shell; the Joinder of Moon-Hines-Tigrett Operating Company, Inc. in Reynolds Plaintiffs' Joint Motion to Settle and Compromise Disputed Claim Pursuant to Rule 9019 of the Bankruptcy Rules of Procedure (Bankr. Dkt. 147)[4] filed by Moon-Hines-Tigrett Operating Company, Inc. ("Moon-Hines-Tigrett"); the Joinder of Moon-Hines-Tigrett Operating Company, Inc. in Reynolds Plaintiffs' Response to the Debtor's Objection to the Trustee's Notice of Proposed Abandonment of Real Property (Bankr. Dkt. 148) filed by Moon-Hines-Tigrett; the Joint Motion to Approve Compromise and Settlement (the "Conquest Joint Motion to Settle" or, together with the Grouped Settling Defendants Joint Motion to Settle, the "Joint Motions to Settle") (Bankr. Dkt. 152) filed by Conquest Exploration Company ("Conquest" or, together with the Grouped Settling Defendants, the "Defendants") and the Trustee; the Debtor's Memorandum in Opposition to Joint Motion to Settle and Compromise Disputed Claim (the "Debtor Response to Reynolds Parties Joint Motion to Settle") (Bankr. Dkt. 170) filed by the Debtor; the Debtor's Memorandum in Opposition to Joint Motion to Settle and Compromise Disputed Claim (the "Debtor Response to Conquest Joint Motion to Settle") (Bankr. Dkt. 172) filed by the Debtor; the Reynolds Plaintiffs' Reply to Debtor's Response to Joint Motion to Settle and Compromise Disputed Claim Pursuant to Rule 9019 of the Bankruptcy Rules of Procedure (the "Reynolds Parties Reply to Debtor Response to Reynolds Parties Joint

---

[4] Hereinafter, the Court will refer to the Reynolds Parties Joint Motion to Settle and the joinders filed by Chevron/Shell and Moon-Hines-Tigrett collectively as the "Grouped Settling Defendants Joint Motion to Settle." The Court will refer to the Reynolds Parties, Chevron/Shell, and Moon-Hines-Tigrett collectively as the "Grouped Settling Defendants."

Motion to Settle") (Bankr. Dkt. 173) filed by the Reynolds Parties; the Joinder of Chevron U.S.A. Inc., Chevron Corporation, Texaco Inc., Four Star Oil & Gas Company, and Shell Western E&P, Inc. in the Reynolds Plaintiffs' Reply to Debtor's Response to Joint Motion to Settle and Compromise Disputed Claim Pursuant to Rule 9019 of the Bankruptcy Rules of Procedure (Bankr. Dkt. 174) filed by Chevron/Shell; and the Joinder of Moon-Hines-Tigrett Operating Company, Inc. in Reynolds Plaintiffs' Reply to Debtor's Response to Joint Motion to Settle and Compromise Disputed Claim Pursuant to Rule 9019 of the Bankruptcy Rules of Procedure (Bankr. Dkt. 175) filed by Moon-Hines-Tigrett in the Bankruptcy Case.

At the Hearing, Jeffrey P. Reynolds ("Reynolds") argued on behalf of the Reynolds Parties, Samuel J. Duncan ("Duncan") argued on behalf of the Trustee, and Sean S. Cassidy ("Cassidy") argued on behalf of the Debtor. Elizabeth Crowell ("Crowell") argued on behalf of Conquest in support of the Conquest Joint Motion to Settle, but she joined in Reynolds' arguments regarding the Notice of Abandonment. Counsel for Chevron/Shell and Moon-Hines-Tigrett appeared at the Hearing and joined in Reynolds' arguments on all issues. The Court, being fully advised in the premises, finds that the Objection to Abandonment should be overruled, the Grouped Settling Defendants Joint Motion to Settle should be granted, and the Conquest Joint Motion to Settle should be denied for the reasons that follow.

## Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this case pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Notice of the Notice of Abandonment, the Objection to Abandonment, and the Joint Motions to Settle was proper under the circumstances.

**Facts**

1.      In 1991, the Debtor's father, Gerald Donald ("Donald"), acquired real property located in Wayne County, Mississippi (the "Subject Property") from a bank that had foreclosed on the Subject Property.

2.      In 1996 and 1998, Donald filed two (2) nearly-identical lawsuits[5] against several parties, including the Defendants, seeking damages related to the purported contamination of the Subject Property from the disposal of radioactive materials and other hazardous substances.

3.      On May 5, 2000, the Debtors initiated the Bankruptcy Case by filing a petition for relief (Bankr. Dkt. 1) pursuant to chapter 13 of the Bankruptcy Code. On August 7, 2000, the Debtors filed statements and schedules regarding their income, expenses, and creditors (the "Statements and Schedules") (Bankr. Dkt. 2). At that time, no information relating to the Subject Property, the Circuit Court Lawsuit, or the District Court Lawsuit appeared in the Statements and Schedules.

4.      On November 6, 2000, the Court entered the Order Confirming Plan, Awarding Fees, and Adjudicating Related Matters (Bankr. Dkt. 21) confirming the Debtors' chapter 13 plan.

5.      Donald died on January 15, 2001. The Debtor was Donald's sole heir and beneficiary. (Adv. Dkt. 45, Ex. 17 at 24-25).

---

[5] The first lawsuit, now titled *Stephanie Howard, Executrix of the Estate of Gerald Donald v. Fina Oil and Chemical Company, et al.*, No. 5-97-55 (the "Circuit Court Lawsuit"), was filed on May 17, 1996 in the Circuit Court of Hinds County, Mississippi and subsequently was transferred to the Circuit Court of Wayne County, Mississippi (the "Circuit Court"). The second lawsuit, now titled *Stephanie Howard, Executrix of the Estate of Gerald Donald v. Marvin Lewis Davis et al.*, No. 2:98-CV-15-KS-MTP (the "District Court Lawsuit"), was filed on January 20, 1998 in the United States District Court for the Southern District of Mississippi.

6.      On February 1, 2001, the Debtor filed the Petition for Probate of Will and Letters Testamentary (Adv. Dkt. 45, Ex. 17 at 8) in the Chancery Court for the Second Judicial District of Jones County, Mississippi (the "Chancery Court") and was appointed the executrix of Donald's estate pursuant to the Chancery Court's Order Admitting Will to Probate and Granting Letters Testamentary. (*Id.* at 24-26).

7.      The Debtor filed the Motion to Substitute Plaintiffs (Adv. Dkt. 1, Ex. 7) in the Circuit Court on March 29, 2001. On April 6, 2001, the Debtor, in her capacity as the executrix of Donald's estate, was substituted for Donald as the plaintiff in the Circuit Court Lawsuit. (Adv. Dkt. 1, Ex. 10).

8.      On February 18, 2005, the Debtor, in her capacity as the executrix of Donald's estate, was substituted for Donald as the plaintiff in the District Court Lawsuit (Adv. Dkt. 1, Ex. 11).[6]

9.      On August 10, 2005, the Trustee filed the Final Report and Account (the "Final Report") (Bankr. Dkt. 42). On August 15, 2005, the Court entered the Discharge of Debtor After Completion of Chapter 13 Plan (Bankr. Dkt. 43) and the Final Decree/Order Closing Case (Bankr. Dkt. 44).

10.      On December 12, 2005, the Circuit Court issued a Memorandum Opinion (Adv. Dkt. 1, Ex. 12) directing the Debtor either to exhaust her administrative clean-up remedies with the Mississippi Commission on Environmental Quality ("MCEQ"), which has the exclusive authority over such matters, or to proceed with the Circuit Court Lawsuit without being allowed to seek damages for the possible clean-up of the Subject Property. The Debtor then filed the

---

[6] According to the Order substituting the Debtor as plaintiff in the District Court Lawsuit, the Debtor filed the motion to substitute in May 2004. (Adv. Dkt. 1, Ex. 11 at 1-2).

Petition and Request for Hearing (Adv. Dkt. 1, Ex. 5) with the MCEQ on January 9, 2006 (the "MCEQ Litigation").[7]

11.     On December 8, 2011, the Chancery Court entered the Order Baring [*sic*] Claims, Waiving First and Final Accounting, Distributing Assets, Discharging Executrix and Closing Estate (Adv. Dkt. 50, Ex. 9) closing Donald's estate, discharging the Debtor as executrix of the estate, and distributing the estate's assets.

12.     The Defendants discovered the existence of the Bankruptcy Case in July 2013. Soon thereafter, the Defendants raised the defense of judicial estoppel in the Circuit Court Lawsuit, the District Court Lawsuit, and the MCEQ Litigation (collectively, the "Related Proceedings"). According to the Debtor and the Defendants, all of the Related Proceedings are currently stayed.

13.     On September 24, 2013, the Debtor filed the Motion to Vacate Final Decree and to Re-open Case to Amend Schedules and State [*sic*] of Financial Affairs (the "Motion to Reopen") (Bankr. Dkt. 50) requesting the Court to reopen the Bankruptcy Case so that the Statements and Schedules could be amended "to disclose Mrs. Howard's interest in civil actions (one in the Circuit Court of Wayne County, Mississippi and one in Federal District Court, Southern District of Mississippi) to recover damages resulting from property contamination." On November 25, 2013, the Court entered the Order Vacating Final Decree and Re-Opening Proceeding (Bankr. Dkt. 61) granting the Motion to Reopen.

---

[7] The Debtor subsequently added the Defendants as defendants in the MCEQ Litigation on March 24, 2011 by filing an Amended Petition and Request for Hearing (the "MDEQ Petition") (Adv. Dkt. 1, Ex. 6) with the Mississippi Department of Environmental Quality ("MDEQ"), which serves as the MCEQ's technical, administrative, and legal staff.

14.    On February 12, 2014, the Reynolds Parties initiated the Adversary by filing the Complaint for Declaratory Judgment (Adv. Dkt. 1) arguing that the Debtor should be judicially estopped from pursuing her claims in the Related Proceedings because she never disclosed her inheritance of the Subject Property or the Related Proceedings to the Court or the Trustee during the pendency of the Bankruptcy Case. Conquest, Moon-Hines-Tigrett, and Chevron/Shell subsequently intervened in the Adversary.

15.    On May 1, 2014, the Reynolds Parties filed the Plaintiffs' Motion for Summary Judgment (the "Defendants Summary Judgment Motion")[8] (Adv. Dkt. 45), and Conquest, Chevron/Shell, and Moon-Hines-Tigrett subsequently joined in the Defendants Summary Judgment Motion. (Adv. Dkts. 47, 48, & 52).

16.    Also on May 1, 2014, the Debtor filed the Motion for Summary Judgment (the "Debtor Summary Judgment Motion") (Adv. Dkt. 49).

17.    The Defendants Summary Judgment Motion and the Debtor Summary Judgment Motion came before the Court for hearing on September 3, 2014. The Court took the matter under advisement and then issued the Memorandum Opinion and Order: (1) Granting the Plaintiffs' Summary Judgment Motion and (2) Denying the Debtor's Summary Judgment Motion (Adv. Dkt. 81) and the Final Judgment on the Plaintiffs' Summary Judgment Motion and the Debtor's Summary Judgment Motion (Adv. Dkt. 82) (collectively, the "Court's Summary Judgment Opinion") on October 27, 2014. In the Court's Summary Judgment Opinion, the Court held that the Debtor is judicially estopped from pursuing her claims in the Related Proceedings.

---

[8] For purposes of clarity and consistency, the Court will define all motions and pleadings filed in the Adversary by the Defendants as the "Defendants _____" despite that these parties were actually the plaintiffs in the Adversary.

The Court, however, held that the Trustee is not judicially estopped from pursing the Debtor's claims in the Related Proceedings for the benefit of the Debtor's creditors. The Court provided that if the Trustee does pursue the Debtor's claims and obtains a recovery, any funds that remain after the distribution to any creditors and the payment of the Trustee's statutory fees will be refunded to the Defendants who paid such funds and not to the Debtor.

18.     On April 12, 2015, the Trustee filed the Notice of Abandonment providing notice of his intent to abandon the Subject Property under 11 U.S.C. § 554.[9]

19.     On April 23, 2015, the Reynolds Parties filed the Reynolds Parties Brief in Support of Abandonment.

20.     On April 27, 2015, the Debtor filed the Objection to Abandonment requesting the Court to order the Trustee to retain the property until the completion of the Related Proceedings.

21.     On May 1, 2015, the Reynolds Parties filed the Reynolds Parties Response to Objection to Abandonment. Chevron/Shell and Moon-Hines-Tigrett subsequently joined in the Reynolds Parties Response to Objection to Abandonment. (Bankr. Dkts. 146 & 148).[10] Hereinafter, the Court will refer to the Reynolds Parties Response to Objection to Abandonment and the joinders filed by Chevron/Shell and Moon-Hines-Tigrett collectively as the "Grouped Settling Defendants Response to Objection to Abandonment."

---

[9] Hereinafter, all code sections refer to the Bankruptcy Code found at title 11 of the United States Code unless otherwise noted.

[10] Although Conquest did not file a joinder in the Reynolds Parties Response to Objection to Abandonment, Crowell stated at the Hearing that Conquest joined in the Reynolds Parties' arguments in opposition to the Objection to Abandonment.

22.     On May 8, 2015, the Reynolds Parties and the Trustee filed the Reynolds Parties Joint Motion to Settle. Chevron/Shell and Moon-Hines-Tigrett subsequently joined in the the Reynolds Parties Joint Motion to Settle. (Bankr. Dkts. 145 & 147).

23.     On May 15, 2015, Conquest and the Trustee filed the Conquest Joint Motion to Settle.

24.     On May 28, 2015, the Debtor filed the Debtor Response to Reynolds Parties Joint Motion to Settle opposing the settlement between the Reynolds Parties and the Trustee.

25.     On June 5, 2015, the Debtor filed the Debtor Response to Conquest Joint Motion to Settle opposing the settlement between Conquest and the Trustee.

26.     On June 9, 2015, the Reynolds Parties filed the Reynolds Parties Reply to Debtor Response to Reynolds Parties Joint Motion to Settle. Chevron/Shell and Moon-Hines-Tigrett subsequently joined in the Reynolds Parties Reply to Debtor Response to Reynolds Parties Joint Motion to Settle. (Bankr. Dkts. 174 & 175).

27.     At the Hearing on June 16, 2015, the Court heard the issues related to the Notice of Abandonment, the Objection to Abandonment, the Joint Motions to Settle, the Debtor Response to Reynolds Parties Joint Motion to Settle, and the Debtor Response to Conquest Joint Motion to Settle. At the conclusion of the Hearing, the Court announced that it would take the abandonment and settlement issues under advisement and issue a written opinion.

28.     On June 18, 2015, the Debtor filed the Debtor's Motion to Supplement List of Witnesses and Exhibits from June 16, 2015 Hearing (the "Debtor Motion to Supplement") (Bankr. Dkt. 178) requesting the Court to allow the Debtor to admit an additional exhibit (a January 5, 2015 email (the "Smith Stagg-Duncan Email") from Julie F. Batt, an employee of Cassidy's law firm, Smith Stag, L.L.C. ("Smith Stag") to Duncan) into evidence regarding the

Objection to Abandonment. No party filed a timely response to the Debtor Motion to Supplement, and it was granted by the Court on July 20, 2015. (Bankr. Dkt. 189). Accordingly, the Smith Stag-Duncan Email was admitted into evidence as (Debtor Ex. 2 on Abandonment).[11]

## Discussion

The terms of the Grouped Settling Defendants Joint Motion to Settle provide that it is contingent upon the Trustee's successful abandonment of the Subject Property. Further, Crowell stated at the Hearing that the Conquest Joint Motion to Settle is contingent upon both the Trustee's successful abandonment of the Subject Property and the Court's approval of the Grouped Settling Defendants Joint Motion to Settle. Therefore, the Court first will address the Notice of Abandonment and the Objection to Abandonment. The Court then will address the Grouped Settling Defendants Joint Motion to Settle and the Conquest Joint Motion to Settle, in that order.

## I.      Notice of Abandonment and Objection to Abandonment

Pursuant to § 554, a trustee may abandon property of the estate if the property is either burdensome to the estate or of inconsequential value and benefit to the estate. 11 U.S.C. § 554(a). Here, the Trustee wishes to abandon the Subject Property because he alleges that it is both burdensome to the Debtor's bankruptcy estate and of inconsequential value and benefit to the estate. The Trustee argues that the retention of the Subject Property is burdensome to the Debtor's bankruptcy estate because the property is hindered by the Related Proceedings that

---

[11] Exhibits introduced into evidence at the Hearing on the issue of whether the Trustee should be allowed to abandon the Subject Property are cited as "([Party] Ex. __ on Abandonment)"; and exhibits introduced into evidence at the Hearing on the issue of whether the Joint Motions to Settle should be approved are cited as "([Party] Ex. __ on Settlement)". All exhibits on both issues were introduced into evidence without objection.

have been pending in some form or another for nearly twenty (20) years whereas abandoning the property will enable the Trustee, pending Court approval, to settle the Related Proceedings. The Trustee also contends that the Subject Property exposes the bankruptcy estate to potential liability because there is old equipment, a ramp, maintained ATV trails, and evidence of trespassing on the property. In addition, the Trustee asserts that there is no fence surrounding the Subject Property nor are there any signs posted on the property prohibiting hunting, prohibiting trespassing, or warning the public of possible hazards or contamination.

As for the Subject Property's value and benefit to the Debtor's bankruptcy estate, the Trustee pointed to the Debtor's Amended Schedule A – Real Property (Bankr. Dkt. 86) filed on January 29, 2015, which provides that the value of the Subject Property is "unknown." The Trustee also introduced into evidence two (2) printouts showing that (a) the Wayne County Tax Assessor has determined that the Subject Property's total value is $7,800.00 and its assessed value is $1,170.00 and (b) the Subject Property's "LAND USE CODE CLASS" is commercial forestry. (Tr. Exs. 4a & 4b on Abandonment). The Trustee introduced into evidence maps and photographs that show the Subject Property is located in a wooded rural area of Mississippi at least fifteen (15) miles away from the nearest town. (Tr. Exs. 1-3 & 5-7 on Abandonment). According to the Trustee, the abandonment of the Subject Property will actually benefit the Debtor's bankruptcy estate because it is a necessary condition to the pending settlements with the Defendants that will result in the full payment of all of the Debtor's unsecured creditors who filed proofs of claims.

The Debtor does not contest that the Subject Property is of inconsequential value or that the retention of the Subject Property is burdensome to the Debtor's bankruptcy estate.[12] Instead, the Debtor argues that the Trustee should not be allowed to abandon the Subject Property because the Trustee owes a fiduciary duty to the Debtor to retain the property and pursue the Debtor's claims in the Related Proceedings to ensure the property is remediated. In support of this position, the Debtor cites *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494 (1986) ("*Midlantic*"). There, the United States Supreme Court held that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards, although this exception to abandonment is not all-encompassing. *See infra* Part I.B. According to the Debtor, the Subject Property is contaminated with known carcinogens and is in violation of the Solid Wastes Disposal Law of 1974, MISS. CODE ANN. § 17-17-1 *et seq.* In that regard, the Debtor introduced into evidence a collective exhibit consisting of several environmental assessments (the "Environmental Assessments") (Debtor Ex. 1 on Abandonment) of the Subject Property. The Debtor contends that in light of the Court's Summary Judgment

---

[12] The Debtor did not discuss the value of the Subject Property or its burden on her bankruptcy estate at the Hearing. The only instance in which the Debtor has substantively mentioned these factors is in the Objection to Abandonment where she states that "[t]he pursuit of . . . clean up is not burdensome to the estate or to the Trustee as Counsel for the Debtor has agreed to pursue same at absolutely no cost whatsoever to the estate." The Court, however, has already held that Smith Stag, by virtue of its representation of the Debtor in appealing the Court's Memorandum Opinion and Order Denying: (1) Debtor's Motion to Alter or Amend Judgment or for New Trial; (2) Motion to Stay Judgment Pending Motion to Alter or Amend Judgment or for New Trial or, in the Alternative, Motion to Stay Pending Appeal; and (3) Debtor's Motion to Extend Deadlines to File Amended Schedules (the "Opinion Denying Motion to Alter or Amend") (Adv. Dkt. 117), holds an interest adverse to the Debtor's bankruptcy estate and, thus, is not able to represent the Trustee in pursuing the Debtor's claims in the Related Proceedings. (Bankr. Dkt. 121).

Opinion holding that the Debtor is judicially estopped from pursuing her claims in the Related Proceedings, the Trustee is the only person who can ensure that the Subject Property is remediated. If the Subject Property is abandoned from the bankruptcy estate, the Debtor asserts that she will possess the property with no recourse available to ensure its remediation, and, accordingly, she will be exposed to liability from the EPA, the MDEQ, or other government agency.

The Defendants and the Trustee respond to the Debtor's arguments in several ways. As a procedural matter, the Defendants argue that the Debtor does not have standing to object to the Trustee's proposed abandonment because she is judicially estopped from pursuing her claims in the Related Proceedings. As for the Trustee's ability to abandon the Subject Property, the Defendants and the Trustee argue that the Trustee should be able to abandon the Subject Property because no imminent and identifiable harm exists in relation to the property. Finally, in response to the Debtor's arguments regarding the Trustee's duty to the Debtor, the Trustee argues that his primary duty is to assist the Debtor in her chapter 13 case, which he is doing in this instance by abandoning the Subject Property and, thus, enabling the Debtor's unsecured creditors to be paid in full through the proposed settlements of the Related Proceedings.

### A.     Standing to Object to the Notice of Abandonment

As a threshold matter, the Court will first address the Defendants' argument that the Debtor lacks standing to object to the Notice of Abandonment. In the Grouped Settling Defendants Response to Objection to Abandonment and at the Hearing, the Defendants briefly argued that the Debtor does not have standing to object to the Notice of Abandonment because she is judicially estopped from pursuing her claims in the Related Proceedings. Although the Defendants do not specify what type of standing the Debtor lacks to object to the Notice of

Abandonment, they do cite two (2) cases in support of their position: *In re Davidson*, 402 B.R. 877 (Bankr. S.D. Ind. 2009) and *In re Drost*, 228 B.R. 208 (Bankr. N.D. Ind. 1998). In *Davidson* and *Drost*, the bankruptcy courts did not discuss constitutional standing, but, instead, each court held that a chapter 7 debtor did not have "bankruptcy standing" to object to a trustee's disposition of estate property. "Bankruptcy standing" is a form of prudential standing that is more narrow and exacting than constitutional standing under Article III. *In re Ray*, 597 F.3d 871, 874-75 (7th Cir. 2010); *In re Morreale*, No. 13-27310 TBM, 2015 WL 3897796, at *7 (Bankr. D. Colo. May 28, 2015). As with the traditional constitutional standing requirements under Article III, prudential standing requirements must be met for a party to have standing. *In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 693 (Bankr. W.D. Tex. 2011); *see also St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 538-39 (5th Cir. 2009). Prudential standing requirements, however, are not derived from the Constitution but, instead, exist through a judicially-created doctrine. *Minerals Cont'l Inc. v. Lacampana, Inc. (In re Minerals Cont'l Inc.)*, No. H-12-03099, 2013 WL 1352223, at *2 (S.D. Tex. 2013).  By virtue of the Defendants' citations to *Davidson* and *Drost*, cases in which the bankruptcy courts do not analyze a party's constitutional standing, the Court interprets their argument as a challenge to the Debtor's prudential standing to object to the Notice of Abandonment.

Although the traditional constitutional requirements represent the mandatory minimum requirements for a party to have standing, Congress can "modify or even abrogate prudential standing requirements, thus extending standing to the full extent permitted by Article III." *St. Paul Fire & Marine Ins. Co.*, 579 F.3d at 539 (quoting another source). In Rule 6007 of the Federal Rules of Bankruptcy Procedure ("Rule 6007"), Congress has extended standing to the full extent permitted by Article III by allowing any "party-in-interest" to object to a proposed

abandonment of property. *See In re C-Power Prods., Inc.*, 230 B.R. 800, 804 (Bankr. N.D. Tex. 1998). Therefore, in lieu of prudential "bankruptcy standing" requirements, the Debtor must satisfy the statutory "party-in-interest" requirement.

The term "party-in-interest" appears in many different sections of the Bankruptcy Code but is not defined in § 101. The legislative history suggests the term intentionally was omitted from the list of definitions in § 101 to allow some flexibility in its use. *See In re N. Am. Oil & Gas, Inc.*, 130 B.R. 473, 479 (Bankr. W.D. Tex. 1990), *abrogated on other grounds by Pritchard v. U.S. Trustee (In re England)*, 153 F.3d 232 (5th Cir. 1998). Specifically, the Fifth Circuit Court of Appeals has broadly interpreted the term to include any creditor of the debtor "as well as any other person with a sufficient stake in [the] outcome of a [bankruptcy] proceeding so as to require representation." *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, S.A. de C.V.*, 347 F.3d 589, 595 (5th Cir. 2003); *see also Johnson v. Deutsche Bank Nat'l Trust Co.*, No. 3:12-CV-3542-L, 2013 WL 3810715, at *6 (N.D. Tex. 2013); *In re Presto*, 376 B.R. 554, 564 (Bankr. S.D. Tex. 2007). The outcome of the current proceeding before the Court (whether the Trustee may abandon the Subject Property) hinges on whether the Trustee has a duty to ensure that the Subject Property owned by the Debtor is remediated. If the Trustee were not allowed to abandon the Subject Property because of environmental concerns, the Trustee may then have additional duties in relation to the Debtor's Subject Property. In addition, if the abandonment were not approved, the proposed settlements of the Related Proceedings would be withdrawn, and the proceedings seeking the remediation of the Subject Property would continue. For these reasons, the Court finds that the Debtor has a sufficient stake in the outcome of this proceeding, and, thus, she is a "party-in-interest" who has standing under Rule 6007. Although case law addressing analogous facts is scant, the Court's determination on the standing issue is in line

with the analysis provided by a prominent bankruptcy treatise on the subject. *See* 10 COLLIER ON BANKRUPTCY ¶ 6007.04 n.1 (16th ed. 2015) ("[O]wners of property affected by the abandonment should have standing to bring . . . environmental issues to the court's attention."). Having determined that the Debtor has standing to object to the Notice of Abandonment, the Court will now turn to the merits of the Notice of Abandonment and the Objection to Abandonment.

### B.    Abandonment of the Subject Property

As the Court previously stated, a trustee may abandon property of the estate pursuant to § 554 if the property is either burdensome to the estate or of inconsequential value and benefit to the estate. 11 U.S.C. 554(a). The Court finds that the Trustee has established that the Subject Property is both burdensome to the estate and of inconsequential value and benefit to the estate. In light of the nearly twenty (20)-year old litigation involving the Subject Property, the purported environmental concerns and code violations, and the potential liability regarding trespassers, the Court finds that the Subject Property is burdensome to the estate. In addition, the minimal reported value of the Subject Property and its alleged contamination make it very unlikely that the property could be sold for the benefit of the Debtor's bankruptcy estate. Thus, the Court also finds that the Subject Property is of inconsequential value and benefit to the estate.

Having determined that the proposed abandonment of the Subject Property satisfies the requirements set forth in § 554, the Court will now address the merits of the Objection to Abandonment. The Debtor's overarching argument in opposition to the Trustee's proposed abandonment of the Subject Property is that the Trustee owes a duty to the Debtor to ensure that the Subject Property is environmentally remediated. In support of this position, the Debtor largely relies on the Supreme Court's decision in *Midlantic*. Before discussing *Midlantic* and its

progeny, the Court will first address what appears to be a misunderstanding on the part of the Debtor regarding a chapter 13 trustee's general duties.

Section 1302 governs the duties of a chapter 13 trustee. 11 U.S.C. § 1302. Despite the Debtor's insistence that the Trustee has a duty to the Debtor to ensure that any contamination on the Subject Property is cleaned up, no such duty is enumerated in § 1302(b) or the provisions of § 704(a) that are made applicable to chapter 13 cases by § 1302(b)(1). As the Trustee stated at the Hearing, a trustee does have duties relating to the Debtor, such as to "advise, other than on legal matters, and assist the debtor in performance under the plan" and "ensure that the debtor commences making timely payments under section 1326 of this title." 11 U.S.C. § 1302(b)(4), (5). None of these obligations specifically requires a trustee to seek the remediation of a debtor's purportedly contaminated property. Moreover, although a chapter 13 trustee has a broad array of duties and powers under the Bankruptcy Code, the trustee's primary duty, as the legal representative of bankruptcy estate, is owed to all of the bankruptcy estate's creditors. *Overbaugh v. Household Bank N.A. (In re Overbaugh)*, 559 F.3d 125, 130 (2d Cir. 2009); *Andrews v. Loheit (In re Andrews)*, 49 F.3d 1404, 1407 (9th Cir. 1995) (citing *Tower Loan of Miss., Inc. v. Maddox (In re Maddox),* 15 F.3d 1347, 1355 (5th Cir. 1994)); *In re Liles*, 292 B.R. 138, 139-40 (Bankr. E.D. Tex. 2002); *see also* 11 U.S.C. § 323.

Here, the Debtor has not provided any statutory basis for the Trustee's purported duty to the Debtor to ensure the remediation of the Subject Property. Instead, the Debtor has cited two (2) cases at the Hearing, neither of which supports her position: *Gower v. Farmers Home Administration (In re Davis)*, 899 F.2d 1136, 1143 n.15 (11th Cir. 1990) and *Midlantic*. In *In re Davis*, the Eleventh Circuit Court of Appeals echoes the Court's point by stating that "[t]he bankruptcy trustee does not represent the interests of the debtor alone; rather, he owes a complex

set of obligations and fiduciary duties to the court, the debtor, the shareholders (in the case of a bankrupt corporation), and, *most importantly*, the creditors." 899 F.2d at 1143 n.15 (emphasis added). The Debtor's reliance on *Midlantic* for the proposition that the Trustee owes a fiduciary duty to the Debtor is also misplaced as the Supreme Court in that case recognized an exception to a trustee's abandonment power in light of a trustee's duty to yield to governmental interests in the public health and safety, not a trustee's duty to remediate property for a debtor's personal benefit.

Having generally discussed a chapter 13 trustee's statutory duties, the Court will now address *Midlantic* and its exception to a trustee's abandonment power in more detail. As previously stated, in *Midlantic*, the Supreme Court discussed a trustee's duties concerning environmentally impacted property and held that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards. 474 U.S. at 502-07. The Supreme Court, however, qualified that holding by stating:

> This exception to the abandonment power vested in the trustee by § 544 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from imminent and identifiable harm.

*Id.* at 507 n.9. The majority of Courts that have interpreted footnote nine (9) in *Midlantic* have held that the "narrow" exception to a trustee's abandonment power only applies in situations where an imminent and identified harm to the public health and safety exists. *See N.M. Env't Dep't v. Foulston (In re L.F. Jennings)*, 4 F.3d 887, 890 (10th Cir. 1993) ("[B]efore abandonment of a property can violate *Midlantic* the property must represent an immediate and identifiable harm to public health or safety.") (citations omitted); *Borden, Inc. v. Wells-Fargo*

*Business Credit (In re Smith-Douglass, Inc.)*, 856 F.2d 12, 16 (4th Cir. 1988) ("[T]his narrow exception applies where there is a serious health risk, not where the hazards are speculative or may await appropriate action by an environmental agency."); *Minn. Pollution Control Agency v. Gouveia (In re Globe Bldg. Materials)*, 345 B.R. 619, 629 (Bankr. N.D. Ind. 2006) ("This Court also deems the *Midlantic* decision to stand solely for the proposition that a Chapter 7 trustee may not *abandon* property from a bankruptcy estate under 11 U.S.C. § 554(a) without taking actions necessary to *abate* conditions which pose an 'imminent and identifiable harm' to 'the public health or safety'."); *In re Guterl Special Steel Corp.*, 316 B.R. 843, 858-59 (Bankr. W.D. Pa. 2004) ("If there is no imminent threat to public or safety, abandonment pursuant to § 554(a) may be permitted even though state laws or regulations designed to protect public health or safety will be violated as a consequence."); *In re Unidigital, Inc.*, 262 B.R. 283, 286-87 (Bankr. D. Del. 2001) (applying *Midlantic* and allowing abandonment because there was not an imminent harm to the public health or safety); *In re Pilz Compact Disc, Inc.*, 229 B.R. 630, 641 (Bankr. E.D. Pa. 1999) ("[I]t would be inaccurate to conclude that a trustee may never abandon property which does not comply with various state environmental regulations. If there is no evidence of danger of immediate harm, the property may be abandoned."); *In re St. Lawrence Corp.*, 239 B.R. 720, 724 (Bankr. D.N.J. 1999) ("Following *Midlantic,* abandonment of contaminated real property is permitted unless there is a showing of "imminent and identifiable harm."); *In re McCrory Corp.*, 188 B.R. 763, 768 (Bankr. S.D.N.Y. 1995) ("Where there has been a violation of state environmental laws but there is not any imminent harm or danger to the public, abandonment has been permitted."); *In re H.F. Radandt, Inc.*, 160 B.R. 323, 328 (Bankr. W.D. Wisc. 1993) (applying *Midlantic* and holding that a trustee could abandon property when there was no showing of imminent or identifiable danger relating to environmental contamination of the

property); *In re Sheffield Oil Co.*, 162 B.R. 339, 341 (Bankr. M.D. Ala. 1993) ("The restriction precludes abandonment only when abandonment would pose an 'imminent and identifiable' harm to the public health or safety. The restriction does not encompass a 'speculative' or 'indeterminate future violation' that may result from abandonment.") *In re Nat'l Gypsum Co.*, 139 B.R. 397, 413 (N.D. Tex. 1992) ("The Supreme Court in *Midlantic* further restricted the ability of a trustee or debtor to abandon property where such abandonment would result in 'imminent and identifiable harm' to the public health or safety."); *In re Doyle Lumber, Inc.*, 137 B.R. 197, 203 (Bankr. W.D. Va. 1992) (overruling objections to a trustee's abandonment of property because there was not an immediate threat to public health or safety); *In re Shore Co.*, 134 B.R. 572, 578 (Bankr. E.D. Tex. 1991) ("A careful review of the *Midlantic* decision and resultant case law convinces this Court that a trustee's right to abandon environmentally impacted estate property is limited only by the precondition that the trustee remediate any imminent and identifiable danger present on the property proposed to be abandoned."); *Leavell v. Karnes*, 143 B.R. 212, 218 (S.D. Ill. 1990) ("[I]n order to comply with the mandate of *Midlantic*, the bankruptcy court must first determine whether conditions on the property pose an immediate and identifiable threat to the public health or safety."); *In re Anthony Ferrante & Sons, Inc.*, 119 B.R. 45, 49 (D.N.J. 1990) ("[B]efore . . . laws can operate to restrict the otherwise unfettered abandonment power under § 554(a), 'imminent and identifiable harm' to the public must be shown."); *In re* FCX, Inc., 96 B.R. 49, 54 (Bankr. E.D.N.C. 1989) (citation omitted) ("Full compliance with all environmental laws is not required prior to abandonment, but abandonment is not authorized when there is an immediate threat to the public health and safety and an imminent danger of death or illness."); *see also* 9 NORTON BANKR. L. & PRAC. 3d § 178:17 (footnote omitted) ("The Court's holding in *Midlantic* seems to indicate that only in situations

where an imminent and serious threat to the environment exists will environmental regulations preempt the abandonment power conferred upon trustees under the Bankruptcy Code.").

A minority of courts have broadly interpreted the exception set forth in *Midlantic* and held that a trustee is prohibited from abandoning property in violation of state environmental laws even if there is no imminent and identified harm to the public health and safety.  *See Lancaster v. Tenn. (In re Wall Tube & Metal Prods. Co.)*, 831 F.2d 118, 122 (6th Cir. 1987) (disallowing abandonment where a continuing violation of state environmental laws would occur, without regard for the existence of an imminent and identifiable harm to public health and safety); *In re Am. Coastal Energy Inc.*, 399 B.R. 805, 813 (Bankr. S.D. Tex. 2009) ("The Court reads the Supreme Court's *Midlantic* opinion to require the Court to determine whether the debtor is violating a statute 'reasonably designed to protect the public health or safety from identified hazards,' not the extent to which particular conduct imposes actual and imminent threats."); *In re Microfab, Inc.*, 105 B.R. 161, 169 (Bankr. D. Mass. 1989) ("This Court concludes that *Midlantic* requires full compliance with state environmental laws."); *In re Peerless Plating Co.*, 70 B.R. 943, 946 n.1 (Bankr. W.D. Mich. 1987) ("If the matter were one purely of bankruptcy law the Court would agree that the narrow reading given to *Midlantic* . . . is more in harmony with the Bankruptcy Code. But this Court cannot convince itself that such a narrow reading is consistent with the intent of *Midlantic*.").

Having considered the reasoning of the cases interpreting *Midlantic*, the Court agrees with the majority view and holds that the exception to a trustee's abandonment power set forth in *Midlantic* is limited to situations where an imminent and identified harm to the public health and safety exists. Applying this standard to the situation at hand, the Court finds that the purported contamination of the Subject Property does not present an imminent and identified harm to the

public health and safety that would warrant the application of *Midlantic*'s narrow exception to the Trustee's abandonment powers.

The Debtor has the burden of proving that the condition of the Subject Property creates an imminent and identified harm to the public. *See In re St. Lawrence Corp.*, 239 B.R. at 726-27 (explaining that after the party proposing the abandonment satisfies their initial burden under § 554 of proving that the property to be abandoned is either burdensome to the estate or is of inconsequential value and benefit to the estate, the burden then shifts to the party opposing abandonment under *Midlantic* to prove that the contamination of the property creates an imminent and identifiable harm to the public). According to the Debtor, the Environmental Assessments demonstrate an imminent harm to the public health and safety. This Court disagrees. The Court has examined the Environmental Assessments but has found no information, evidence, or opinions showing that the condition of the Subject Property poses a potential harm to the public health or safety, much less that such harm is imminent.

The Environmental Assessments consist of documents prepared by three individuals: William Clay Kimbrell ("Kimbrell"), John M. Jarrett ("Jarrett"), and Edwin M. Cargill

("Cargill").[13] In the Kimbrell Letter, Kimbrell describes (and attaches photographs of) "three pits and one large mound of an, as yet, unidentified waste" located on the Subject Property. According to Kimbrell, the Subject Property contains, *inter alia*, garbage, tarlike material, and oil globules. In the Jarrett Survey, Jarrett opined that Naturally Occurring Radioactive Material (NORM) is present on the Subject Property and recommended that an additional survey of the property be conducted. In the Kimbrell Affidavit, Kimbrell stated that in his opinion, the Subject Property "has surface/soil contamination from oilfield service related activities." (**Debtor Ex. 1 on Abandonment at 105**). In the Kimbrell Report, Kimbrell states that his "Laboratory Analysis" of samples taken from the Subject Property indicate elevated readings of Radium 226, barium, chlorides, chromium, lead, zinc, total xylenes, benzene, ethyl benzene, toluene, arsenic, cadmium, mercury, and total petroleum hydrocarbons. He then summarized his overall opinion regarding the contamination of the Subject Property as follows:

> Based on the reconnaissances and the review of other expert's reports and analysis . . . it is my opinion that the [Subject Property] has surface soil/sediment contamination from oilfield service related activities. From the visual reconnaissances, sampling and other experts findings, it is my opinion that all three of these sites (pit areas) need to be properly remediated and cleaned-up.

(*Id.* at 108).

---

[13] Specifically, the Environmental Assessments consist of a July 23, 1996 letter titled "Donald Property" signed by Kimbrell that includes multiple photographs of the Subject Property (the "Kimbrell Letter") (Debtor Ex. 1 on Abandonment at 1-6); a "Site Identification Survey" prepared by Jarrett on September 7, 1996 (the "Jarrett Survey") (*Id.* at 11-15); an affidavit prepared by Kimbrell on September 20, 2000 (the "Kimbrell Affidavit") (*Id.* at 104-05); an "Expert Report" prepared by Kimbrell on February 8, 2000 (the "Kimbrell Report") (*Id.* at 106-94); an affidavit prepared by Cargill on September 21, 2000 (the "Cargill Affidavit") (*Id.* at 195-96); and a "Survey and Characterization of Radioactive Waste on the Donald Property in Wayne County Mississippi" prepared by Cargill on February 9, 2000 (the "Cargill Survey") (*Id.* at 197-233). The Court notes that the Environmental Assessments included several duplicates of the aforementioned documents, but for efficiency and clarity purposes, the Court only cites to one copy of each duplicated document.

In the Cargill Affidavit, Cargill states that he identified five (5) areas of significant Technically Enhanced Radioactive Material (TERM) contamination on the Subject Property and that in his opinion, the Subject Property "has surface/soil contamination from oilfield service related activities, including but not limited to TERM contamination." (*Id.* at 196). In the Cargill Survey, Cargill stated that the Subject Property contained five (5) areas with significant TERM contamination. Specifically, he concluded that "[t]here is  approximately . . . 623 cubic yards of TERM contaminated material to be removed from [the Subject Property] for disposal." (*Id.* at 201).

Nowhere in the Environmental Assessments, however, is there any information regarding how the presence of the materials can or will affect the public health or safety. Further, the Debtor did not submit any evidence (documentary, testimonial, or otherwise) at the Hearing as to the effect of the described contamination, its extent, or its imminence. Instead, the Debtor simply introduced the Environmental Assessments into evidence and asserted a conclusory allegation that the presence of "radioactive materials" and "known human carcinogens" creates an imminent harm. But as the majority of cases have held since *Midlantic*, a trustee is not prohibited from abandoning property just because it is contaminated or does not comply with various state environmental regulations. The critical inquiry is whether the property represents an imminent and identified harm to the public health and safety. The Court notes that the most recent component of the Environmental Assessments was created on September 21, 2000, nearly fifteen (15) years ago. That no known harm has occurred to the public after fifteen (15) years suggests that whatever contamination may exist on the Subject Property is not a threat to the public, at least not an imminent one. This conclusion is further supported by Kimbrell's observation in the

Kimbrell Report that when he visited the Subject Property in January 2000, it was "in essentially the same visual condition" as it was in 1996. (*Id.* at 109).

In addition, the Court finds it is reasonable to conclude that MDEQ's inaction as to the Subject Property for nearly a decade indicates that the property's condition does not pose an imminent threat to the public health and safety. *See In re Smith-Douglass, Inc.*, 856 F.2d at 16 (finding that the bankruptcy court's determination that there was no threat of immediate harm was not erroneous because the state environmental agency had not pursued any enforcement action); *In re Shore Co.*, 134 B.R. at 579 ("Given the lack of action on the part of the [state water commission], this Court can only conclude that it has long been the judgment of the [commission] that the refinery property constituted more of an environmental concern than an immediate danger."); *In re Anthony Ferrante & Sons, Inc.*, 119 B.R. at 50 (considering the state department of environmental protection's eight-year wait before bringing an enforcement action against the debtor as additional support for its conclusion that the property in question did not pose an imminent threat of harm to the health of the debtor's customers); *White v. Coon (In re Purco, Inc.)*, 76 B.R. 523, 533 (Bankr. W.D. Pa. 1987) (inferring from the state department of environmental resources' lack of interest in the abandonment proceeding that there is no threat to the public health or safety which warrants the department's participation); *In re Franklin Signal Corp.*, 65 B.R. 268, 269 n.1 (Bankr. D. Minn. 1986) ("The logical inference of the State's inaction [regarding drums filled with possibly hazardous waste] is that the drums do not pose any imminent threat to the public.")

The MCEQ has known about the Debtor's allegations regarding the purported contamination of the Subject Property since at least January 9, 2006, when the Debtor filed her initial Petition and Request for Hearing (Adv. Dkt. 1, Ex. 5). Thus, the MCEQ has been involved

in this matter for more than nine (9) years, but has not ordered any party to remediate the Subject Property. The Debtor insists that the reason the MCEQ has not taken any steps to ensure remediation of the Subject Property is because of the pending MCEQ Litigation. The MCEQ has the power to "enforce rules and regulations implementing the powers and duties of the commission under any and all statutes within the commission's jurisdiction, and as the commission may deem necessary to prevent, control and abate existing or potential pollution." MISS. CODE ANN. § 49-2-9. The MCEQ has delegated several enforcement powers to the MDEQ, such as the power to issue administrative orders to "Prohibit, Control or Abate Discharges of Contaminants and Wastes into Air and Waters of the State," "Require Appropriate Remedial Measures to Prevent, Control or Abate Air and Water Pollution or to Cause the Proper Management of Solid Wastes," and "Require Compliance with Permits and Regulations." 11-001 MISS. CODE R. 1.1(E) (LexisNexis 2015); *see also* MISS. CODE ANN. § 49-2-13(j) (granting the executive director of the MDEQ the power to "issue, modify or revoke any and all orders under authority granted by the commission"). Assuming, as the Debtor claims,[14] that the MDEQ is awaiting the resolution of the MCEQ Litigation to issue any of the aforementioned orders regarding the remediation of the Subject Property, the Court finds it reasonable also to assume

---

[14] The Court notes that the Debtor has not provided any evidence supporting this contention.

that the MDEQ would exercise its delegated authority to issue an emergency order pursuant to

Miss. Code Ann. § 49-17-27[15] if the situation warranted such response. *See id.*

At the Hearing, the Defendants collectively introduced into evidence multiple court

orders and letters of correspondence involving the MDEQ and the Circuit Court (the "MDEQ

and Circuit Court Documents") (Reynolds Parties Ex. 1 on Abandonment).[16] In the MDEQ and

Circuit Court Documents, Furrh states several times that the MDEQ reviewed the Environmental

---

[15] Miss. Code Ann. § 49-17-27 provides, in relevant part:

> In the event an emergency is found to exist by the commission, it may issue an emergency order as circumstances may require. Said emergency order shall become operative at the time and date designated therein and shall remain in force until modified or cancelled by the commission or superseded by a regular order of the commission or for a period of forty-five (45) days from its effective date, whichever shall occur first, and may be enforced by an injunction if necessary.

> * * *

> When, in the opinion of the commission or its executive director, an emergency situation exists which creates an imminent and substantial endangerment threatening the public health and safety or the lives and property of the people of this state, notice shall be given immediately to local governing authorities, both county and municipal, the state emergency management organization, and the governor for appropriate action in accordance with applicable laws for protections against disaster situations.

Miss. Code Ann. § 49-17-27.

[16] Specifically, the MDEQ and Circuit Court Documents consist of (1) a May 24, 2007 letter, with attachments, sent by Roy Furrh ("Furrh"), general counsel for the MDEQ, to Michael G. Stag, Esq. ("Stag"), another attorney at Smith Stag (the "May 2007 MDEQ Letter") (Reynolds Parties Ex. 1 on Abandonment at 1-48); (2) a July 25, 2007 letter sent from Furrh to Stag (the "July 2007 MDEQ Letter") (*Id.* at 49-61); (3) a March 3, 2011 Order (the "March 2011 Circuit Court Order") issued by the Circuit Court with an attached letter dated October 11, 2010 (the "October 2010 MDEQ Letter") sent from Furrh to the Hon. Lester F. Williamson, Jr. ("Circuit Court Judge Williamson"), Circuit Judge for the Tenth Circuit Court District (*Id.* at 62-73); and (4) an October 24, 2013 Order issued by the MCEQ (the "October 2013 MCEQ Order") (*Id.* at 74-82).

Assessments and inspected the Subject Property in person. Yet the MDEQ never took any remedial or enforcement action regarding the Subject Property. In fact, Furrh never states in the MDEQ Documents that it is a certainty that the Subject Property needs to be remediated. (*See id.* at 2 (noting that "[t]he property will be fully assessed, and *possibly* remediated") (emphasis added)); *Id.* at 69 (explaining that after a hearing, the MCEQ "would then make the ultimate decision as to what additional site assessment, cleanup or other remediation, *if any*, is necessary") (emphasis added)). Finally, in a letter sent to Circuit Court Judge Williamson, Furrh states that the Subject Property "is not a significant priority site for MDEQ." (*Id.* at 69 n.1).

In total, the MDEQ and Circuit Court Documents indicate that the condition of the Subject Property does not pose an imminent and identified harm to the public health and safety. Further, the MCEQ has not appeared or taken part in any of the proceedings before the Court since the Bankruptcy Case was reopened in November 2013.[17] For all of these reasons, the Court finds[18] that the Debtor has not satisfied her burden in proving that the Subject Property's condition creates an imminent and identified harm to the public health and safety. Therefore, the Objection to Abandonment should be overruled.

---

[17] The Reynolds Parties have provided notice: (1) to the MCEQ in February 2014 that the Debtor had reopened her Bankruptcy Case and that they were pursuing a defense of judicial estoppel (Adv. Dkt. 97, Ex. 3); (2) to Furrh in October 2014 that the Court issued the Court's Summary Judgment Opinion (*Id.* at Ex. 4); and (3) to Furrh in May 2015 of the Notice of Abandonment, the Reynolds Parties Brief in Support of Abandonment, the Objection to Abandonment, and the Reynolds Parties Response to Objection to Abandonment (Bankr. Dkt. 139).

[18] The Court notes that it considered the Smith Stag-Duncan Email when reaching this decision. The Smith Stagg-Duncan Email reflects that the Environmental Assessments were transmitted to the Trustee on January 5, 2015.

## II.   Joint Motions to Settle

Having determined that the proposed abandonment satisfies § 554 and Objection to Abandonment should be overruled, the Court now turns to the Joint Motions to Settle. Under Rule 9019(a) of the Federal Rules of Bankruptcy Procedure ("Rule 9019(a)"), bankruptcy courts are empowered to approve a compromise and settlement of a lawsuit if the settlement is "fair and equitable and in the best interest of the estate." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop, Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355 (5th Cir. 1997) (internal citation omitted). In deciding whether a settlement is "fair and equitable," the Court must make a well-informed decision "comparing the terms of the compromise with the likely rewards of litigation." *Id.* at 356 (citing *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)). Specifically, the Court must weigh: "(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* (citing *In re Jackson Brewing Co.*, 624 F.2d at 602). As previously discussed, the Conquest Joint Motion to Settle is contingent upon the Grouped Settling Defendants Joint Motion to Settle being granted by the Court. Therefore, the Court will first address the Grouped Settling Defendants Joint Motion to Settle.

### A.   Grouped Settling Defendants Joint Motion to Settle

Under the proposed settlement between the Trustee and the Grouped Settling Defendants (the "Grouped Settling Defendants Proposed Settlement") (Bankr. Dkt. 143-1) attached to the Grouped Settling Defendants Joint Motion to Settle, the Trustee, on behalf of the Debtor's bankruptcy estate, agrees to a full and complete release of all possible claims against the

Grouped Settling Defendants relating to the Subject Property, including those set forth in the Related Proceedings. In consideration of this release, the Grouped Settling Defendants agree to pay the Trustee $2,700.00, which is enough to pay all unpaid creditors who have filed proofs of claim in the Bankruptcy Case and the Trustee's statutory fees. Any surplus after distribution to such creditors and the Trustee will be returned to Reynolds on behalf of the Grouped Settling Defendants. In addition, the Grouped Settling Defendants agree to indemnify the Trustee, individually and in his official capacity, from any claims instituted by government agencies relating to the remediation of the Subject Property.

After considering the three (3) factors set forth in *In re Cajun Electric Power Cooperative, Incorporated*, 119 F.3d at 355 ("*In re Cajun Elec.*"), the Court finds that the Grouped Settling Defendants Proposed Settlement is fair and equitable and in the best interest of the Debtor's bankruptcy estate. The Court will now elaborate on those factors.

### 1.    Probability of Success in the Litigation

The first factor the Court must weigh is the Trustee's probability of success in the Related Proceedings, with due consideration for the uncertainty in fact and law. "With respect to the first factor, it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement." *In re Cajun Elec.*, 119 F.3d at 356. "The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision." *Id.* (footnote omitted) (citing *LaSalle Nat'l Bank v. Holland (In re American Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir. 1987)). With respect to this factor, the Reynolds Parties introduced into evidence at the Hearing the Circuit Court Lawsuit Complaint and Jury Demand (the "Circuit Court Complaint") (Reynolds Parties Ex. 1 on Settlement) and the District Court

Lawsuit Supplemental and Amended Complaint (the "District Court Complaint") (Reynolds Parties Ex. 2 on Settlement).

As previously stated, the Related Proceedings have been pending in one form or another for nearly twenty (20) years. According to the October 2013 MCEQ Order, the Subject Property was originally owned by Davis Brothers Contracting Company ("Davis"), who used the property to wash out the vacuum tanks on trucks used to haul oilfield wastes for customers. (Reynolds Parties Ex. 1 on Abandonment at 75). Davis contracted with as many as a hundred (100) or more companies, including the Defendants. (*Id.*). Roughly five (5) years after purchasing the Subject Property from a bank foreclosure sale, Donald initiated the Circuit Court Lawsuit, the first of the (3) three Related Proceedings. (*Id.*). In the Circuit Court Complaint, the Debtor[19] is suing under seven (7) different legal theories: negligence, nuisance, trespass to land, breach of contract, waste, strict liability, and outrageous conduct. In addition, she is seeking three (3) types of relief: general money damages, punitive damages, and declaratory relief. In 1998, Donald initiated the District Court Lawsuit. In the District Court Complaint, the Debtor[20] is seeking damages and a declaratory judgment under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* In December 2005, the Circuit Court directed the Debtor either to exhaust her administrative clean-up remedies with the MCEQ, which has the exclusive authority over such matters, or to proceed with the Circuit Court Lawsuit without

---

[19] The Court notes that the Circuit Court Complaint was filed in 1996 by Donald as he was not yet deceased, and the Debtor had not yet been substituted for Donald as the plaintiff in the Circuit Court Lawsuit. *See supra* ¶ 7.

[20] The Court notes that similar to the Circuit Court Complaint, the District Court Complaint was filed in 1998 by Donald as he was not yet deceased, and the Debtor had not yet been substituted for Donald as the plaintiff in the District Court Lawsuit. *See supra* ¶ 8.

being allowed to seek damages for the possible clean-up of the Subject Property. The Debtor subsequently filed the MDEQ Petition requesting the MDEQ to hold a hearing for the purpose of taking action against the Defendants.

Regarding this first factor, the Grouped Settling Defendants argue that they have been "exonerated" multiple times by the MDEQ, as evidenced by the MDEQ and Circuit Court Documents introduced into evidence on the abandonment issue.[21] After examining the MDEQ and Circuit Court Documents, the Court does not interpret them as broadly as the Grouped Settling Defendants suggest, but the Court does find that they are relevant to the Trustee's probability of success in pursuing the Debtor's claims in the Related Proceedings. It is clear from the May 2007 MDEQ Letter, July 2007 MDEQ Letter, and the October 2010 MDEQ Letter that as of October 11, 2010, the MDEQ (after conducting a visual inspection of the Subject Property and reviewing all of the information provided by the Debtor, including the Environmental Assessments) concluded that proof was lacking to tie the Defendants to the alleged contamination and that there was insufficient evidence to pursue an enforcement action against the Defendants. In the July 2007 MDEQ Letter, Furrh stated that "[i]n the absence of such minimal proof, then we anticipate a finding that further assessment and remediation of the [Subject Property] must be conducted by the [Debtor] and/or Davis." (Reynolds Parties Ex. 1 on Abandonment at 50).

Following the issuance of the March 2011 Circuit Court Order, in which the Circuit Court indicated that it would dismiss the Debtor's claims regarding clean up and remediation of the Subject Property as soon as the MDEQ issued a final order on the lack of evidence, the

---

[21] Arg. of Reynolds at 11:09:42 – 11:12:15. The Hearing was not transcribed. References to the record of the Hearing are cited by the timestamp of the audio recording.

Debtor filed the MDEQ Petition formally adding the Defendants as defendants in the MCEQ Litigation. In March 5, 2013, the MCEQ set the MCEQ Litigation for hearing in January 2014. (*Id.* at 75-76). In April 2013, the Debtor filed and served, *inter alia*, (1) a notice requesting the Defendants to take part in twenty-one (21) video depositions, (2) a set of interrogatory requests, and (3) a request for production of documents. (*Id.* at 77). The Defendants then filed a motion requesting the MCEQ to deny the Debtor's discovery requests, to which the Debtor responded by filing a motion requesting the MCEQ to compel the Defendants to comply with her requests (*Id.*). The MCEQ then issued the October 2013 MCEQ Order that, *inter alia*, granted the Defendants' request to deny the Debtor's discovery requests. According to the MCEQ, it does not have the authority to compel discovery sought by the Debtor through depositions, interrogatories, and requests for production. (*Id.* at 79). The MCEQ then stated that it had already exercised its authority to subpoena the documents from the Defendants and that although the Defendants only "produced some documents in response to the Commission's subpoenas," the Defendants sufficiently explained their inability to provide the majority of documents. (*Id.* at 81-82). Thus, the MCEQ also denied the Debtor's motion to compel. (*Id.*).

The Court finds that the MDEQ and Circuit Court Documents, when read as a whole, indicate that the Trustee does not have a probability of success in pursuing the Debtor's claims in the Related Proceedings. While the fact that the Debtor is suing under many different legal theories in the Related Proceedings might suggest that the Trustee is likely to be successful on at least one of the Debtor's claims, the MDEQ and Circuit Court Documents suggest otherwise. The documents establish that, as of October 11, 2010, the MDEQ (after conducting a visual inspection of the Subject Property and reviewing all of the information provided by the Debtor, including the Environmental Assessments) concluded that after fourteen (14) years of litigation,

"there is no specific evidence of responsibility on the part of any [Defendant] for the contamination." (*Id.* at 70). The Court does recognize that the October 2010 MDEQ Letter was written prior to the Defendants being formally added as defendants in the MCEQ Litigation, but the MDEQ and Circuit Court Documents establish that the Defendants were heavily involved in the litigation up to that point in time. Further, the October 2013 MCEQ Order indicates that only "some documents" were produced by the Defendants after the Defendants were officially added to the MCEQ Litigation. While it is certainly possible that there may be specific evidence that was not obtained during the prior fourteen (14)-plus years of litigation, tying the Defendants to the alleged contamination of the Subject Property located in these "some documents" provided to the MCEQ, the Court would not go as far to say that it is probable. The Court accordingly finds that the Trustee does not have a probability of success in pursuing the Debtor's claims in the MCEQ Litigation.

As for the Circuit Court Lawsuit and the District Court Lawsuit, if there is no specific evidence of responsibility on the part of any Defendant to the alleged contamination, it is not probable that the Trustee will succeed in pursuing the Debtor's claims for negligence, nuisance, trespass to land, breach of contract, waste, strict liability, outrageous conduct, or under CERCLA, all of which are premised on the Defendants' connection to the presence of hazardous materials on the Subject Property. The Court thus finds that the first factor weighs in favor of granting the Grouped Settling Defendants Joint Motion to Settle.

### 2.    Complexity and Likely Duration of the Litigation

The second factor the Court must weigh in considering whether to approve a settlement is the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay. As the Court has frequently noted, the oldest of the Related Proceedings has been pending

for more than nineteen (19) years. The Trustee stated at the Hearing that he could not afford to pursue the Related Proceedings by himself because of the scope and complexity of the collective litigation. As described in the Court's analysis of the first factor, the Debtor is pursuing at least eight (8) different legal theories in three (3) separate forums against more than twenty (20) defendants. Although the parties did not cite any specific costs of litigation, it is apparent that the litigation involved in the Related Proceedings is expert-intensive and, thus, would likely be expensive. Although the Debtor has already obtained the Environmental Assessments regarding the alleged contamination of the Subject Property, the Court can anticipate that there may be a need for additional and/or updated environmental reports since the Environmental Assessments were compiled more than fifteen (15) years ago. As the Trustee noted at the Hearing, no eligible[22] attorneys have approached the Trustee interested in pursuing the Debtor's claims in the Related Proceedings. Even if a willing attorney did come forward, the sheer amount of parties, legal theories, forums, expert reports, and pleadings involved in the Related Proceedings would require the new attorney to invest a substantial amount of time to familiarize themselves with the procedural history, facts, and parties involved. For these reasons, the Court finds that the complexity, prospective expense, and likely duration of the Related Proceedings, together with the probable delay associated with employing new counsel, cause this second factor to also weigh in favor of granting the Grouped Settling Defendants Joint Motion to Settle.

---

[22] The Court reiterates that despite Smith Stag's willingness to represent the Trustee in pursuing the Debtor's claims in the Related Proceedings, the Court already has held that Smith Stag, by virtue of its representation of the Debtor in appealing the Court's Opinion Denying Motion to Alter or Amend, holds an interest adverse to the Debtor's bankruptcy estate and, thus, is not able to represent the Trustee in pursuing the Debtor's claims in the Related Proceedings. (Bankr. Dkt. 121).

### 3.     Other Factors Bearing on the Wisdom of the Compromise

With respect to the third, "catch-all provision," the Fifth Circuit has specified two (2) additional factors for a bankruptcy court to weigh when determining whether to approve a proposed settlement: (1) "the best interest of the creditors, 'with proper deference to their reasonable views'" and (2) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *In re Cajun Elec.*, 119 F.3d at 356 (citing *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995)). The Court finds that the Grouped Settling Defendants Joint Motion to Settle is in the best interest of creditors. The Grouped Settling Defendants Proposed Settlement is specifically tailored to provide for the full payment of all of the Debtor's unsecured creditors who filed proofs of claim in the Bankruptcy Case but were not paid in full when the case was closed in August 2005.[23] Further, no creditors objected to the Grouped Settling Defendants Joint Motion to Settle. *See In re Foster Mortg. Corp.*, 68 F.3d at 917-18.

Relevant to the next factor (the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion), the Reynolds Parties collectively introduced into evidence at the Hearing, a series of emails (the "Reynolds-Duncan Emails") (Reynolds Parties Ex. 3 on Settlement) between Reynolds and Duncan regarding settlement discussions. After reviewing the Reynolds-Duncan Emails, which span over the course of one and a half (1 ½) months, the Court is convinced that the Grouped Settling Defendants Proposed Settlement is the product of an arms-length negotiation, and not the product of fraud or collusion. Indeed, the emails reveal a thorough and legitimate negotiation between Duncan and Reynolds as

---

[23] At the Hearing, the Trustee stated that according to the Final Report, roughly $2,200.00 is all that remains to be paid to the Debtor's unsecured creditors who filed proofs of claim.

to whether the Grouped Settling Defendants would agree to indemnify the Trustee and what would be the scope of said indemnification. Further, the numerous attachments to the Reynolds-Duncan Emails show the parties' many drafts of the Grouped Settling Defendants Proposed Settlement throughout the negotiation process. For these reasons, the Court finds that the settlement is the product of arms-length bargaining.

Another factor relevant to the Court's evaluation of the Grouped Settling Defendants Joint Motion to Settle was pointed out by the Trustee at Hearing when he noted that there is no incentive for the bankruptcy estate to pursue the Debtor's claims in the Related Proceedings. Pursuant to the Court's Summary Judgment Opinion, the Debtor is judicially estopped from pursuing her claims in the Related Proceedings. Even though the Trustee may pursue the Debtor's claims in the Related Proceedings, if he obtains a recovery, any funds that remain after the distribution to any creditors and the payment of the Trustee's statutory fees will be refunded to the Defendants who paid such funds and not to the Debtor. Because the Grouped Settling Defendants Proposed Settlement provides that the Debtor's bankruptcy estate will receive enough money to pay in full all of the Debtor's unsecured creditors who filed proofs of claim and the Trustee's statutory fees, there is no outcome the Trustee could obtain in the Related Proceedings that would benefit the estate more than the Grouped Settling Defendants Proposed Settlement. For this reason, as well as the Court's determination that the Grouped Settling Defendants Proposed Settlement is in the best interest of the creditors and is the product of arms-length bargaining, the Court finds that the third factor weighs in favor of approving the proposed settlement. In sum, the Court finds that all three factors provided by the Fifth Circuit in *In re Cajun Elec.* weigh in favor of the Court approving the Grouped Settling Defendants Proposed Settlement.

At the Hearing, Cassidy stated that the Debtor opposes the Grouped Settling Defendants Joint Motion to Settle for the same reasons she objected to the Notice of Abandonment. Specifically, Cassidy argued that the proposed settlement is not fair and equitable because it would abrogate the Trustee's duty to the Debtor concerning the environmental condition of the Subject Property. As the Court stated in its analysis of the Notice of Abandonment and the Objection to Abandonment, no such duty exists under the Bankruptcy Code. *See supra* Part I.B. Therefore, the Court, after weighing all of the relevant factors, finds that the Grouped Settling Defendants Joint Motion to Settle should be granted.

### B.    Conquest Joint Motion to Settle

Having determined that the Grouped Settling Defendants Joint Motion to Settle should be granted, the Court will now address the Conquest Joint Motion to Settle. Similar to the Grouped Settling Defendants Joint Motion to Settle, a copy of the proposed settlement between the Trustee and Conquest (the "Conquest Proposed Settlement") (Bankr. Dkt. 152-1) was attached to the Conquest Joint Motion to Settle. In the Conquest Proposed Settlement, the Trustee agrees to a full and complete release of all possible claims against Conquest relating to the Subject Property and the Related Proceedings, but Conquest does not provide any form of consideration (such as offering its own separate indemnification of the Trustee or offering to pay any unforeseen amount over and above the $2,700.00 provided by the Grouped Settling Defendants in the Grouped Settling Defendants Proposed Settlement) in exchange for the Trustee's full and complete release of said claims. After the Court's inquiry at the Hearing, Crowell and Duncan conceded that the Trustee would not receive any consideration under the terms of the Conquest Proposed Settlement for releasing all possible claims against Conquest.

Although the Court has the power to approve settlements and the power to enforce settlements, "the construction and enforcement of settlement agreements is governed by principles of state law applicable to contracts generally." *Lee v. Hunt*, 631 F.2d 1171, 1173-74 (5th Cir. Unit A 1980). Mississippi courts apply state contract law to negotiated settlement agreements. *See Estate of Davis v. O'Neill*, 42 So. 3d 520, 527 (Miss. 2010). Under Mississippi contract law, consideration is one of the necessary elements in order to create a valid, enforceable contract. *Id.* The Mississippi Supreme Court has defined consideration as: "(a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification or destruction of a legal relation, or (d) a return promise, bargained for and given in exchange for the promise." *Id.*

The Court finds that the absence of consideration in exchange for the Trustee's release of all possible claims against Conquest related to the Subject Property makes the Conquest Proposed Settlement unenforceable under Mississippi law. As a result, the Court finds that it would not be fair and equitable and in the best interest of the estate to approve the Conquest Proposed Settlement under Rule 9019(a). *See De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 846 (Bankr. S.D. Tex. 2009) (refusing to approve settlement agreement under Rule 9019 because the agreement did not comply with the statute of frauds and, thus, was unenforceable under state law); *In re Frye*, 216 B.R. 166, 170-71 (Bankr. E.D. Va. 1997) (holding that it is necessary to determine whether the agreement constitutes a binding contact under state law before analyzing the settlement under Rule 9019(a)); *In re Cincinnati Microwave, Inc.*, 210 B.R. 130 (Bankr. S.D. Ohio 1997) ("The reason for denying approval [of the proposed settlement agreement between the debtor and plaintiffs was that the] debtor would receive no consideration for its proposed contribution to the Settlement Agreement."); *Ehre v. People of N.Y. (In re Adirondack Ry. Corp.)*, 95 B.R. 867 (N.D.N.Y. 1988) (denying proposed

settlement under Rule 9019 and noting that "approval of the proposed "settlement," in its current legally unenforceable state, will, in all probability spawn even more litigation with respect to its implementation"); *see also In re Jackson Brewing Co.*, 624 F.2d at 603 ("It is undeniable that a compromise must be based on valuable consideration."). The Court accordingly finds that the Conquest Joint Motion to Settle should be denied.

## Conclusion

For the above and foregoing reasons, the Court finds that the Objection to Abandonment should be overruled, the Grouped Settling Defendants Joint Motion to Settle should be granted, and the Conquest Joint Motion to Settle should be denied.

IT IS, THEREFORE, ORDERED that the Objection to Abandonment is hereby overruled.

IT IS FURTHER ORDERED that the Grouped Settling Defendants Joint Motion to Settle is hereby granted.

IT IS FURTHER ORDERED that the Conquest Joint Motion to Settle is hereby denied.

##END OF OPINION##